## Blanchard, Appellant, *v.* German Evangelical Protestant Church,

*Real estate—Title—Marketable title — Lessor and lessee — Religious corporation—Evidence.*

1. In an action against a religious corporation for damages for breach of a contract to lease real estate by "a good and valid lease," binding instructions for the defendant are proper, on the ground that the lease offered was based upon a marketable title, where it appears that the land proposed to be leased was in the year 1788 granted to trustees for the benefit of two specified church congregations; that in the year 1812 a union of the churches was effected; that in 1821 said united congregation was incorporated and was subsequently authorized by the legislature to lease part of the premises.

2. The fact that the identity of the present congregation with the two originally named depends in part on ancient documents and upon facts existing beyond the memory of any living witness, and further that a third party had asserted in good faith a claim of title against the defendant, with a threat of litigation, are immaterial where under the evidence there is no reasonable doubt either at law or in fact that there is no outstanding title inconsistent with defendant's.

Argued Oct. 16, 1916. Appeal, No. 139, Oct. T., 1916, from judgment of C. P. Allegheny Co., Oct. T., 1914, No. 933, for defendant by direction in case of Charles A. Blanchard v. Trustees, Elders and Wardens of the German Evangelical Protestant Church in Pittsburgh. Before Brown, C. J., Potter, Moschzisker, Frazer and Walling, JJ. Affirmed.

Assumpsit for breach of contract to lease.

The facts appear by the following opinion of Shafer, P. J., dismissing plaintiff's motions for judgment non obstante veredicto and for a new trial:

The action is for damages alleged to have been done to the plaintiff by a breach of defendant's agreement to make a good and valid lease to the plaintiff of a lot in the

City of Pittsburgh, at the corner of Sixth avenue and Smithfield street. A verdict was directed for the defendant, and the plaintiff now moves for judgment non obstante veredicto and for a new trial.

The motion for a new trial is founded on the rejection of evidence offered by the plaintiff of various items of damage alleged to have been suffered by him. This evidence was rejected because of the agreement in the contract sued upon, that damages should be limited to a return of the ten thousand dollars paid at the time the option was given, or to twenty thousand dollars if under the extension agreement the plaintiff was entitled to so much. The evidence rejected concerned items of damage other than these sums. We are convinced that under the terms of the contract the evidence was properly excluded. The motion for a new trial is therefore refused.

In view of the conclusion we have arrived at as to the disposition of the motion for judgment non obstante veredicto, we do not deem it necessary to discuss the question raised as to the amount the plaintiff would be entitled to if entitled to recover. The defendant claims that a certain answer made by the plaintiff to a petition of the defendant in the suit of a third person concerning the $10,-000, mentioned in the option, works an estoppel of the plaintiff and precludes his recovering any damages. Under the evidence, if the plaintiff is entitled to recover, he is entitled to either both the sums of $10,000 paid by him or only the first sum so paid. The amount he is entitled to recover, if at all, is, in any view of the case, a question of law and is a question which, as we have said, it does not seem to be necessary now to discuss.

The question upon which plaintiff's right to recover depends is whether the lease offered to the plaintiff was a good and valid one and would have given the plaintiff a good and marketable title to the proposed leasehold. While a large amount of testimony was taken on the trial, the main facts of the case are not complicated.

In the year 1788 John Penn, Jr., and John Penn made

a deed for the land in question and other land adjoining it, to three trustees, their heirs and assigns, describing them as being "Trustees of the two German religious societies or congregations being known by the name of Congregation of the Protestant Evangelical Church who adheres to the Invariable Augsburg Confession; and the other religious society or congregation being known and distinguished by the name and denomination of the Protestant Reformed Church."

In the habendum the conveyance is said to be "in trust nevertheless for a lot as a site for one or more houses of religious worship and a burial place for the said two religious societies or congregations or their successors in the said Town of Pittsburgh and the vicinity thereof," and it is provided that the property is not to be used for any other purpose or interest. It is conceded, and testified to by witnesses called by each side, who however testified only from their knowledge acquired from historical investigations, that there were in fact, at the time the deed was made, two congregations in Pittsburgh, one Lutheran and the other Reformed, and that some time thereafter a building was erected upon the lot and was used alternately by the two congregations. This common use of the building and lot appear to have been continued until October, 1812. The defendants produced ancient documents, a number of which have the appearance of having been leaves in a note book the binding of which has altogether disappeared, containing what purport to be lists of church officers and statements of various matters connected with the church or churches, there being matters referring to each church in the older statements. On one of these pages is a statement to the effect that on October 18, 1812, a union of the two churches had been effected and one set of church officers elected and one pastor called for the united congregation. In 1821 the congregation was incorporated, the documents or minutes above mentioned referring to the act of incorporation with the same names in the charter and in the

minutes. In 1860 by an Act of Assembly, Feb. 18, 1860, Sec. 3, P. L. 64, the congregation was authorized to remove the bodies from the burial ground on this property and lease 140 feet on Smithfield street. There is no evidence of the existence of more than one congregation in possession of the property or claiming in any way to be one of the congregations referred to in the deed, or to be in any way entitled to the property from 1813 to the present time.

In or about the year 1912 some members of the Pittsburgh Synod of the Reformed Church in the United States conceived the idea that that synod ought to be entitled to a share of the property in question. This synod was formed some forty years ago, and has jurisdiction of the Reformed churches—formerly called German Reformed churches—in Pittsburgh and for a considerable distance around it. At that time a committee of the synod presented its claim to the defendant, requesting or demanding for the synod a share of the property, which was refused. In May, 1913, an option was granted by the defendant to the plaintiff on a lease for 99 years of a part of the property, a copy of which marked Exhibit 1 is annexed to the plaintiff's statement of claim. By this option the defendant agreed to procure an order of the Court of Common Pleas approving the proposed lease, and to make a good and valid lease for the property on the terms set forth or else to refund to the plaintiff the sum of ten thousand dollars paid by him at the time of the execution of the option, the damages on either side in case of failure to carry out the contract being confined to a forfeiture and a return of that sum. The option was to expire in ninety days after notice of the making of the order of court referred to. The defendant thereupon applied to this court for leave to make the lease, under the Price Act, and procured an order to that effect, of which a notice was given to plaintiff on June 24, 1913. On September 22, 1913, the parties made an agreement for the extension of the time within which the plaintiff

should comply with the agreement, to January 10, 1914. On October 20, 1913, there appeared in a Pittsburgh newspaper an article headed, "Synod of Reformed Congregation Claims Ownership in Smithfield Street Site." A copy of this article is attached to plaintiff's statement of claim as Exhibit No. 4, the effect of the substance of the article being that the Pittsburgh Synod of the Reformed Church claims a half interest in the property in question and that they have been frozen out of their rights by the defendants, and that they intended to take legal steps for the possession of their share of the property and had appointed a committee; and it was further stated that explicit instructions had been given by the synod to the committee to proceed without delay, and that the papers were already in the hands of attorneys. Sometime thereafter a formal notice was served upon the plaintiff by a committee of the Synod of the Reformed Church, to the effect that they claimed title to one-half of the property, and that the property was conveyed to the trustees for church purposes and no other, and that the defendants had no right to sell or lease the same, particularly for the purposes of a hotel. On January 8, 1914, counsel for the plaintiff notified the defendant in writing that the plaintiff would not accept the title in its present condition, that is, with the cloud hanging over it created by the claim for one-half of it made by the Reformed Church of the United States, and the threat of litigation made by it. In accordance with this notice the plaintiff refused to accept the lease, and this suit was thereafter brought. The plaintiff now sets up a number of other reasons why the title is unmarketable, besides that alleged in this notice. There is nothing in the case to estop him from doing so when suing for damages from the breach of the contract, although he might be so estopped if the defendant had brought an action against him.

It is claimed by the plaintiff that the legal title to the property still remains in the three trustees or their heirs, and that the heirs of the Penns have a reversionary inter-

est in the property if it is used for any other than church purposes. It is further claimed that the title is unmarketable because it depends in part on oral proof and on ancient documents not readily accessible, and because there having been originally two congregations one of them could not acquire title by lapse of time against the other; and further that there is a bona fide claim of title asserted against both parties and a threat of litigation to sustain it. We do not deem it necessary to discuss these claims in detail. We are clearly of opinion that there is no reasonable doubt, either in law or in fact, that the trustees named in the deed or their heirs have no legal title to the land in question, and that the heirs of the Penns likewise can have no claim. The doubts which the plaintiff suggests as to the identity of the present congregation with the two originally named are founded on the fact that the present state of affairs has existed beyond the memory of any living witness, so that the very antiquity of the defendant's title is alleged as a defect. It is conceded that the agreement to make a good and valid lease is an agreement to make such a lease by a good and marketable title, which means not a title as to the validity of which doubts may be suggested, but one as to which there is no reasonable doubt in law or in fact. If any title which depended upon facts not appearing by the record was therefore to be deemed unmarketable there would be very few marketable titles to be found. One of the commonest instances is where a title passes by descent. How many children or descendants or how many collateral relatives a man had, and who they were, depends upon oral evidence, often widely scattered and difficult to obtain, yet such titles are constantly held to be marketable. It seems to us that so far as the facts are concerned there is no reasonable doubt that since 1813 there has been no congregation claiming the property in question or that the present congregation represents both of the original congregations united, which brings up the question upon which plaintiff put his rejection of the title, the claim of

the Pittsburgh Synod of the Reformed Church. We have here an actual claim to the property, apparently made in good faith, which the claimants threatened to enforce by litigation. We do not understand that the actual making of a claim, or even the bringing of a suit upon it makes the title so attacked unmarketable, in itself. A claim made in good faith, especially if followed up by a suit, is a matter to be taken into consideration in determining whether there is any reasonable doubt as to the title, and these circumstances are entitled to great weight in determining that matter. Where a claim, however, is manifestly and undoubtedly unfounded the assertion of it even by a suit does not render the title unmarketable. It seems to us that the claim set up by the Pittsburgh Synod of the Reformed Church to the property in question beyond a reasonable doubt and in fact beyond any doubt, is entirely unfounded.

Verdict for defendant by direction of the court and judgment thereon. Plaintiff appealed.

*Error assigned,* among others, was in giving binding instructions for the defendant.

*A. Leo. Weil,* with him *Charles M. Thorp* and *L. Pearson Scott,* for appellant.—The title of the defendant corporation to the property agreed to be leased was not good and marketable. It was not a title concerning which no reasonable doubt could exist either in law or in fact: Speakman v. Forepaugh, 44 Pa. 363; Swayne v. Lyon, 67 Pa. 436; Herman v. Somers, 158 Pa. 424; Stone v. Carter (No. 1), 48 Pa. Superior Ct. 236; Presbyterian Congregation of York Boro. v. Johnson, 1 W. & S. 9; Murray v. Ellis, Trustees, 112 Pa. 485; Dayton v. Carter, 206 Pa. 491.

The title of the defendant corporation, as disclosed by evidence dehors the record title, is unmarketable: Fleming v. Burnham et al., 100 N. Y. 1 (2 N. E. Repr. 905); Irving v. Campbell, 121 N. Y. 353 (24 N. E. Repr. 821);

Moore v. Williams, 115 N. Y. 586 (22 N. E. Repr. 233) ;
Swayne v. Lyon, 67 Pa. 436.

*Edwin W. Smith,* of *Reed, Smith, Shaw & Beal,* with
him *T. L. Gartner,* for appellees.—The church corpora-
tion has the legal title as well as the equitable title:
Brendle et al. v. German Reformed Congregation of
Jackson Twp. et al., 33 Pa. 415; Reformed Protestant
Dutch Church in Garden St. v. Mott et al., 7 Paige Ch.
(N. Y.) 77; Krauczunas v. Hoban, 221 Pa. 213; Zion
Church of the Evangelical Assoc. of No. Amer. v. Light, 7
Pa. Superior Ct. 223.

PER CURIAM, January 8, 1917:
The judgment in this case is affirmed on the opinion of
the learned president judge of the court below overruling
plaintiff's motions for a new trial and for judgment non
obstante veredicto.

---

## Montalini *v.* Pennsylvania Co., Appellant.

*Negligence — Railroad companies — Passengers — Passengers
alighting from cars—Premature starting—Conflicting evidence—
Case for jury—Pain and suffering—Damages—Present worth.*

1. In an action brought by a passenger on a railroad train to re-
cover damages for personal injuries alleged to have been sustained
by plaintiff in consequence of the premature starting of the train
while she was endeavoring to alight therefrom at a station platform,
where plaintiff's testimony that while she was descending from the
steps the train started with a jerk, throwing her onto the platform,
was corroborated to some extent by four other witnesses, the case
was for the jury and a verdict and judgment for the plaintiff will
be sustained although six or seven witnesses testified for defend-
ant that after the train had started plaintiff left the car platform,
walked down the steps and jumped off.

2. In such case the court properly charged the jury to the effect
that it is the duty of a railroad company as a common carrier to
use the highest degree of care and to stop its trains for such length
of time as to give passengers a reasonable opportunity to alight,